**YORK TYPOGRAPHICAL UNION NO. 242, affiliated with the International Typographical Union, AFL–CIO, Plaintiff,**

v.

**The MAPLE PRESS COMPANY, Defendant.**

**Civ. A. No. 74–409.**

United States District Court, M. D. Pennsylvania.

Dec. 30, 1977.

Ira H. Weinstock, Jerome H. Gerber, Handler, Gerber & Weinstock, Harrisburg, Pa., for plaintiff.

Spencer R. Liverant, Liverant, Senft & Cohen, York, Pa., Zimmerman & Obadal, Lawrence T. Zimmerman, Washington, D. C., for defendant.

## OPINION

HERMAN, District Judge.

This is a suit by the labor union representing the composing room employees of Defendant Company and its successor of the composing room activities, Bi-Comp, Inc., against the Maple Press Company over the division of the pension fund.

From the record and the suggested findings filed by both the Plaintiff and the Defendant we find the following facts.

The Plaintiff, York Typographical Union No. 242 at all times relevant to this case represented the composing room employees of the Maple Press Company and from on or about February 15, 1973, represented those composing room employees, who thereafter worked for Bi-Comp, Inc.[1]

On October 16, 1963 Plaintiff and Defendant entered into a collective bargaining agreement which provided, inter alia, for the creation of a pension trust fund.

On January 6, 1964 pursuant to this agreement and to agreements with three other labor unions representing other employees of Defendant,[2] a pension trust fund was established under the name of "The Maple Press Company Pension Plan" in which it was provided that Maple Press would pay into the fund 10¢ for each hour each employee worked at straight time. The various collective bargaining agreements required this payment and provided for a ten-year moratorium on the right of the unions to negotiate an increase in this contribution to the fund.

The Pension Plan covered all employees of Maple Press and not just those in the composing room represented by Plaintiff and which as indicated comprised 15 to 20% of the Company's employees.

The Pension Plan provided, in part, that employees could become vested only upon completing 25 years of service and attaining the age of 50 years, and further that employees could receive pensions upon retiring at age 65 with 15 years service (normal retirement) or at age 55 with 25 years service (early retirement).

The Pension Plan also provided that in the event of discontinuance of the Plan, to the extent that the assets were sufficient, moneys would be allocated for the purpose of paying pensions at age 65 in the following order of precedence: to persons who had retired prior to such discontinuance; to employees aged 65 or over on the date of discontinuance; to employees eligible for early retirement on the date of discontinuance; and to all other employees.

From the inception of the Pension Plan the Plan's actuary has been the Wyatt Company and Edwin F. Boynton, a senior actuary of the Wyatt Company, has at all times had the basic actuarial responsibility for the Plan.

The level of benefits to be paid under the Plan is determined by a Pension Plan Committee composed of labor and management representatives on the basis of actuarial evaluations made by the Wyatt Company. When the level of benefits was raised under the Plan, the increased level of benefits was historically paid to already retired employees as well as to future retirees.

The collective bargaining agreement between the company and the union was due to expire on December 31, 1972 and so in early November of that year the parties

---

1. It is agreed that this Court has jurisdiction of this matter under Section 301 of the Labor Management Relations Act (29 U.S.C. § 185).

2. Approximately 80 persons were employed by Maple Press in the composing room which was located at a place separate and apart from the rest of the plant and were represented by Plaintiff union. Approximately 350 persons were employed in other departments at one other location and were represented by the other 3 unions.

met to consider a new collective bargaining agreement. Then in December at another meeting the company told the union that it no longer needed a composing room but that a Mr. Witman, the plant manager, was interested in purchasing it and that if proper terms could be agreed upon the equipment and facilities of the composing room would be sold to him.

The genesis of the problem appears at the next meeting held on January 4, 1973 at which meeting Maple Press was represented by Nicholas Kollman, Vice President, Terrance M. Kramer, Director of Corporate Relations and Lawrence T. Zimmerman, Esquire, Attorney for the company;[3] and the union was represented by J. Harold Barnhart, Jr., President of the Plaintiff union, five members of the scale committee of the Plaintiff and Jack Boris, International Representative of the union. No representative of Wyatt Company was present. At the meeting the company informed the union that there was a strong possibility that Witman would buy the composing room facilities and continue its operation, and would employ the 80 odd persons then working there for Maple Press.

At this meeting the company proposed to the union a two-page labor contract which provided for the discontinuance of the composing room, the termination of all composing room employees and the bargaining relationship with the union, vacation pay arrangements, *and the transfer of certain funds in the Pension Plan to the purchaser,*[4] (which later became Bi-Comp). This two-page labor contract was conditioned on the sale to Bi-Comp being consummated by February 15, 1973, and it was so consummated.

The clause, which gives rise to the first problem, after amendment at the meeting, provided:

**3.** Lawrence T. Zimmerman represented Defendant throughout the trial of this case.

**4.** Emphasis added unless otherwise noted.

**5.** Originally as prepared by the company this clause provided:
"The funds in the Maple Press Company Pension Plan allocable to employees in the

"The funds in the Maple Press Company Pension Plan allocable to employees in the bargaining unit represented by the Union, as determined on the basis of an actuarial review as of the date of sale, shall be transferred to a successor plan agreed to by Comp, Inc., and the Union, provided that such procedure is approved by the Internal Revenue Service."[5]

The contract was then, as so amended, executed by the parties.

The January 4, 1973 meeting was the first time that the company and the union had discussed the pension termination and the allocation of the assets although the company officers had met with the Wyatt representative in Washington sometime prior thereto to discuss the closing of the composing room and the resulting problems with the Pension Plan.

The Wyatt Company did in fact make the actuarial review and allocation, the details of which will be discussed later in this opinion, and as a result of this review, the sum of $111,131 was turned over to the Bi-Comp Pension Fund, which fund carried the same benefits to the Bi-Comp employees as the Maple Press Plan did to the composing room employees. The Bi-Comp plan further provided that the years of service that the transferred employees had accumulated with Maple Press would, for pension purposes, be considered as having been served with Bi-Comp so that if both companies and both plans continued as planned the transferred employees would receive exactly the same pension benefits that they would have received with Maple Press if the composing room had not been severed.

The Plaintiff union avers that the striking out of the words "by the Wyatt Company", in the two-page contract was an indi-

bargaining unit represented by the Union, as determined on the basis of an actuarial review *by the Wyatt Company* as of the date of sale, shall be transferred to a successor plan established by Comp, Inc., provided that such procedure is approved by the Internal Revenue Service."

cation that the parties intended that the actuarial review as provided by this clause be done by someone *other* than the Wyatt Company. The Defendant, Maple Press, on the other hand says that the intent was only that it was not necessary that Wyatt Company be the *exclusive* actuary to make the review but that under certain circumstances, if the union so elected, its actuary could also make such review.

Contending that the Defendant has breached its contract of January 4, 1973 by permitting Wyatt Company to make the actuarial review; that the said review was actuarially unsound and provided for a division of the assets of the Pension Fund which was unfair to Plaintiff members and which violated the preferences set forth in the Pension Plan, Plaintiff in its amended complaint asks the Court to permanently enjoin the allocation of the funds as set forth in the Wyatt actuarial review; determine the proper portion of the fund due Plaintiffs' members; and order Defendant to turn over to Bi-Comp, Inc. the portion to which the Court finds Plaintiffs' members are entitled.

We hold in favor of the Maple Press Company and deny the injunction and the related claims of the Plaintiff.

We first consider the contract of January 4, 1973 and the intent of the parties. It is significant that the original complaint filed on May 24, 1974 found no fault with the fact that the Wyatt Company made the actuarial review but complained only about the result reached by that actuary. It was the February 5, *1976* amended complaint that first complained that Defendants' use of the Wyatt Company was contrary to the parties agreement but Plaintiff seems to have not pressed this claim in its brief or argument. In any event the testimony indicates that it was not the intent of the parties to *preclude* Wyatt from making the review.

Nicholas John Kollman, Vice President of Maple Press, who was the chief negotiator for the company in its negotiations with the local union and with its international which was then represented by Jack Boris, testified that the union never proposed that the Wyatt Company *not* make the "allocation" but that the union which was interested in having the Bi-Comp Company put the allocated amount in the I.T.U. Pension Plan rather than establish a new plan, wanted an opportunity to have the actuary for the international union *review* the Wyatt Company's work if the money was going to be placed in the I.T.U. Fund. At page 263 of the record Kollman testified:

Question: "And did you leave the meeting with the understanding that Wyatt would in fact do the actuarial work with respect to the allocations?"

Answer: "Yes, it was my understanding that Wyatt would do the work and the union would reserve the right to have their actuaries look at it in the event that it did go and was decided later on that the plan would be placed with the I.T.U. pension plan.

Question: Did you believe the union had the same understanding at the conclusion of the meeting?

Answer: Yes."

And on cross-examination at page 266 said:

"I was there and I repeat again: Those conversations that went on prior to the changes in that document were based upon the fact that there was discussions as to whether the money should be allocated into the new pension plan formed by Bi-Comp or whether it should go into the I.T.U. International pension fund. And the International representative did want to reserve some rights for review of Wyatt's figures and basically in the hopes that those monies would be transferred to the I.T.U. fund, no question about it. That's what he wanted."

These assertions are hardly refuted by the local union representative, J. Harold Barnhart [6] the only witness for the Plaintiff

---

6. It should be noted that Jack Boris did not appear as a witness for Plaintiff, although he had been characterized by Mr. Barnhart on cross exam as a very experienced international

representative who had been called in by the local union "for counsel basically on anything that might arise". N.T. 48

on this question. His testimony at page 49 reads in part:

Question: "Wasn't it Mr. Boris' point, the point of the international representative, that because of that, it may well be the I.T.U. would want its own actuary, whoever that might be, to look at the books and have an opportunity to *review* the allocation?

Answer: Surely."

Question: "And that being the case, wasn't it true that Mr. Boris did not attack Wyatt Company, that he did not say to the Wyatt Company that the Wyatt Company was a bad actuary and an actuary that shouldn't be used, but that his point was that he wants the opportunity for some other actuary to review the allocations, whoever would make it?

Answer: That was one of his points.

Question: Wasn't that really the reason for the deletion of the reference to the Wyatt Company, because Mr. Boris did not protest that Wyatt Company should not do it, but that he did not want to prohibit the I.T.U. actuary from also taking a look at it if it was later decided that that would be the way to go?

Answer: Again, that was one of the points he made."

We find that the company did not violate the agreement by having Wyatt Company make the actuarial review.

This brings us to the Actuarial Review so prepared by the Wyatt Company.

Historically, the Wyatt Company, of Washington, D.C., with some 20 branch offices and over 100 actuaries doing work for some 6,000 to 7,000 pension plans, set up the Maple Press Pension Plan in 1963 and continued as the actuary for the Plan from that time to the present. Edwin F. Boynton, a Fellow of the Society of Actuaries, and an actuary for Wyatt Company for 20 years and who was previously involved with the Maple Press Pension Plan throughout,

was the only witness for the Defendant concerning the Plan and the review and apportionment of the funds after the separation of the composing room from the Maple Press Company. His testimony establishes that in late December, 1972, Maple Press representatives came to Wyatt for advice as to how best to handle the shutdown of the composing room facility, the separation of some 80 employees and the division of the money in the fund.

Although the Pension Plan was not offered in evidence by either party, it is agreed that Article XV, Section 3 of the Plan provides in substance that in the event of a *discontinuance of the plan to the extent that assets are sufficient,* these assets will be allocated for the purpose of paying pensions at age 65 in the following order of precedence: (1) to persons who have retired · prior to such discontinuance; (2) to employees aged 65 or over on the date of the discontinuance; (3) to employees eligible for early retirement on the date of discontinuance (*55 years of age with 25 years of service*) and (4) to all other employees.

It is also agreed that the Plan further provides in Article III that employees become vested in the fund only upon completion of 25 years of service and attaining the age of 50 years. And Article IV provides that employees will receive pensions upon retiring at age 65 with 15 years of service (normal retirement) or upon retiring at age 55 with 25 years of service (early retirement).

Faced with these facts, the Wyatt Company advised Maple Press by a letter of December 28, 1972 that as the company actuaries they saw two alternatives in the manner of handling the division of the funds. The first alternative was to follow the *vesting requirements* as set forth in Article III, this being the way termination of employment by voluntary or involuntary separation of *an individual* would be treated. In this Alternative those persons who

have not become vested in the fund, regardless of their length of service with the company or their age would receive nothing.[7]

Wyatt Company, in their initial letter, did not recommend this Alternative but, because of the large number of employees to be separated at one time and because the Internal Revenue Service, who under the law had to approve the allocation and transfer of funds, might view this as a partial termination of Maple Press Plan, thought that Alternative No. 2 was the fairer and better allocation.

Alternative No. 2, as suggested by Wyatt in the letter of December 28, 1972, and the one that the actuary favored followed Article XV of the Plan which as we have noted is the Article which provides for the allocation of the assets in the event of a discontinuance of the Plan. Presumably more of the separated employees would benefit because under this Alternative "all employees would become fully vested in their accrued benefits, to the extent funded". It was for this reason, as well as the actuary's belief that since so many employees were to be separated at one time and that one whole facility at a separate location was being closed down, the Internal Revenue Service would more likely approve this type of allocation than one such as suggested in Alternative No. 1 where some 50 employees would be in the unvested class and would receive nothing.

To be sure, there was no *discontinuance* of the Maple Press Plan and indeed the Bi-Comp Plan was really, as far as the composing room employees were concerned, a *continuance* of the Plan.[8] This was not initially known by the actuaries, but when it became known a week or so after the initial letter this seemed all the more reason why Alternative No. 2 was the fairer way to handle the allocation. Alternative No. 1 did not envision a *transfer* of any funds and so this Alternative went "by the Board". N.T. 172, 173.

The Wyatt Company made its final determination that Alternative No. 2[9] was the proper way to divide these funds and this then was their "actuarial review" in compliance with Paragraph 4 of the Labor Agreement of January 4, 1973.

This determination was made with knowledge that Bi-Comp would adopt a similar plan; with knowledge of the age, sex, and years of service of the employees affected; knowledge of the amount of assets in the trust fund; and knowledge that Bi-Comp did not expect to make payments to its fund for one or two years.

Alternative 2(b) provided for the transfer of $178,297 to the Bi-Comp fund as of December 31, 1972 which was subsequently reduced by about $58,000 to take care of the pensions for seven composing room employees who retired rather than transferring to Bi-Comp.

This Plan established a funding method which would permit both vested and nonvested composing room employees to receive pensions by virtue of the crediting of their prior service with Maple Press and their future service with Bi-Comp.

The Internal Revenue Service finally approved the Wyatt proposal.

7. By this Alternative, which Plaintiff seems to favor, an employee who had worked for the company for 24 years and had reached his 50th birthday, or had worked for the company for more than 25 years but had not reached his 50th birthday would receive nothing. Then if he continued to work for Bi-Comp his years with Maple Press would not count toward retirement from the Bi-Comp fund, for no money would be transferred directly to Bi-Comp since all the allocable funds would be paid to or earmarked for those who have vested interests in it.

8. At the time of the hearing in this matter both Plans continued to operate successfully.

9. In the further study of the manner in which the allocation of the funds should be *effected* two ways, which later became known as (a) and (b) of Alternative No. 2, were suggested. We do not deem it necessary for the purposes of this opinion to elaborate on the differences in (a) and (b) except to point out that (b) or 2(b) as it was then described and which was the means finally used for effecting the allocation of the funds was some $45,000 more favorable to Bi-Comp employees than 2(a).

The Plaintiff contends and its actuarial witness, Conrad M. Siegel, testified that the Plan recommended by Wyatt and adopted by Maple Press as we have outlined it above was actuarially unsound and unfair to the Plaintiff.

Mr. Siegel initially proposed Alternate No. 1 as a fairer and actuarially sound plan and later suggested that an "accounting" method under which the composing room would be treated as one separate entity and the rest of Maple Press treated as another entity from the inception of the Maple Press Plan, and that contributions into the Plan and benefits paid from the Plan to each group would be separately traced and allocated to each entity, thus arriving at a fair sum to be transferred would be a better plan. After Mr. Siegel had received further information concerning the age and service information of the two groups of employees and finding that to follow the "accounting" method would result in no money being transferred to the Bi-Comp Plan but would actually call for $100,000 to be paid by Bi-Comp to Maple Press, he then acknowledged at N.T. 117 that the "accounting" method would be an inherently unfair method.

Mr. Siegle concluded that Alternate No. 1 would in his opinion be the minimal actuarially sound manner of distribution of the part of the pension fund to Bi-Comp. Mr. Boynton testified that such a procedure (Alternate No. 1) since Bi-Comp had continued a similar plan in which the employees of Maple Press who went with Bi-Comp will get credit for the years of service with Maple, would be unfair to the Maple Press employees and would transfer a disproportionate amount of money to the new plan. See page 227 seq. of Notes of Testimony.

The Plaintiff, arguing that the Wyatt plan adopted by the Defendant is actuarially unsound, and that the Defendant has therefore violated its duty under paragraph 4 of the Agreement of January 4, 1973 says

the actuarial review of Wyatt Company should be set aside and suggests that the Court "has the authority to substitute itself for the actuary".[10]

The Defendant argues that the Court may not, in the absence of fraud or bad faith set aside an actuarial evaluation, but in any event that the plan submitted is indeed actuarially sound and not in violation of the Pension Plan Agreement.

Both parties agree that there is very little precedent in this field to guide us in the determination of the role the Court may play after an appraisal has been made.

The Plaintiff cites *Clark v. Kraftco Co.*, 323 F.Supp. 358 (S.D.N.Y.1971) for authority that the Court has the power to review actuarial determinations and if it deems it necessary to substitute its judgment. While it is true that Judge Tyler in Kraftco finds that the power of a Court to review an appraisal is broader than the power to review an arbitration award which, short of fraud or misconduct, is not subject to correction by a Court, he does suggest that, at least in New York State, an appraisal should only be set aside when it is shown by clear and convincing evidence that the appraisal was not honestly made in good faith. After reviewing the distinctions between arbitration awards and appraisals, Judge Tyler set aside the award but on appeal after hearing, the lower court[11] was reversed on the ground that the agreement providing for the actuarial determination provided that the appraisal of the single actuary, who incidentally, like the instant case was not present at the execution of the agreement, was to be final and binding on the parties. Thus it appears that this principal case relied on by Plaintiffs while containing a good bit of dictum is not authority.

Likewise the principal case cited by the Defendants does not appear to be authority on facts such as we have here. In that case, *Lakewood Mfg. Co. v. Home Insur-*

---

10. Plaintiff's request for Conclusions of Law No. 4.

11. Judge Lombard, Senior Circuit Judge of the Second Circuit, sitting by designation, heard the case on the merits in the District Court and wrote the opinion.

*ance Co. of N. Y.*, 422 F.2d 796 (CA 6, 1970) the appraisal was not the result of an agreement under a Labor Management Relation Act which the instant case was, but rather was an insurance company policy holder agreement providing for an appraisal by appraisers and an umpire. Nevertheless the *Lakewood* case does make broad statements concerning the review of an appraisal award which may have some analogy to the case before us. At page 798 the Court says:

"Generally, a court will not interfere with an appraisal award but, to the contrary, will indulge in every reasonable presumption to sustain it in the absence of fraud, mistake, or misfeasance. A court will not substitute its judgment for that of the appraisers or set aside an award for inadequacy or excessiveness unless it is so palpably wrong as to indicate corruption or bias on the part of the appraisers. 44 Am.Jur.2d Insurance § 1719 (1969)."

Our independent research fails to find any Pennsylvania, or any other federal authority in this field; however, in *Green and Coates Street Passenger Railway Co. v. Moore*, 64 Pa. 79 (1870) which indicates that an appraisement is not subject to the strict rules governing arbitration, the lower court in charging the jury stated that appraisals should be set aside only if there is a plain and clear mistake in making the appraisal.

While we have serious doubts concerning the Court's right under the circumstances here to substitute its judgment for that of the actuary and to declare the Wyatt Plan to be actuarially unsound, we conclude that on the facts of this case the Court may and should make a limited review of the appraisal and award.

It must be pointed out here that at no time as far as the Court can determine does the Plaintiff union allege fraud, personal misconduct, bad faith or dishonesty on the part of the Wyatt Company or for that matter on the part of the Maple Press Company.

It should also be pointed out that neither Bi-Comp nor the Trustees of the Bi-Comp Pension have complained about the Wyatt Actuarial Review and the resultant division of the funds.

I have reviewed with great care the Wyatt Proposal which was adopted by the Maple Press Plan; the proposal suggested by Mr. Siegel for Plaintiff; the testimony taken in this case; have weighed the credibility of the witnesses; and have examined in detail the exhibits, especially the numerous letters from Wyatt Co. to Maple Press as well as the letter of Conrad Siegel to Plaintiffs' counsel, attached as an exhibit to the complaint.

After consideration of all relevant material I conclude that while the Plan adopted may not be the best Plan that Wyatt could have proposed, it was such a plan as required of the Defendant by the contract. It is a fair Plan to all of the parties concerned and is actuarially sound. I further conclude that Maple Press properly performed the Agreement made with Typographical Union No. 242 dated January 4, 1973.

This shall constitute the Court's findings of fact and conclusions therein required by the Federal Rule of Civil Procedure No. 52.

An appropriate order will be entered.